1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  SHARON G. BIRENBAUM
   Deputy Attorney General
6  State Bar No. 94925
    455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
    Telephone: (415) 703-5870
8    Fax: (415) 703-1234
    Email: sharon.birenbaum@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

| | |
|---|---|
| **JORGE A. PANTOJA,** | C 07-3572 CRB |
| Petitioner, | |
| v. | |
| **K. PROSPER, Warden,** | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**

1

# TABLE OF CONTENTS

2

| | Page |
|---|---|
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF FACTS | 2 |
|     Prior Incidents | 6 |
|     The Investigation | 7 |
|     Defense Case | 9 |
| STANDARD OF REVIEW | 16 |
| ARGUMENT | 16 |
|     THE STATE COURT REASONABLY FOUND THERE WAS SUFFICIENT EVIDENCE OF MALICE TO SUPPORT THE SECOND DEGREE MURDER CONVICTION | 16 |
|     A.  Law On Sufficiency Of Evidence | 16 |
|     B.  The State Courts' Opinions | 18 |
|     C.  The State Court's Ruling Was Not Contrary To Or An Unreasonable Application Of Supreme Court Precedence | 21 |
| CONCLUSION | 26 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES

2                                                                              **Page**

3  **Cases**

4  *Crawford v. Washington*
   541 U.S. 36 (2004)                                                           2
5
   *Jackson v. Virginia*
6  443 U.S. 307 (1979)                                                          16-18

7  *Juan H. v. Allen*
   408 F.3d 1262 (9th Cir. 2005)                                                18
8
   *Lockyer v. Andrade*
9  538 U.S. 63 (2003)                                                           16

10 *McMillan v. Gomez*
   19 F.3d 465 (9th Cir. 1994)                                                  17
11
   *Myers v. Rhay*
12 577 F.2d 504 511 (9th Cir. 1978)                                            17, 25

13 *Payne v. Borg*
   982 F.2d 335 (9th Cir. 1992)                                                 17
14
   *People v. Ferrell*
15 (1990) 218 Cal.App.3d 828                                                    21

16 *People v. Pantoja*
   122 Cal.App.4th 1 (2004)                                                      2
17
   *People v. Ramirez*
18 (2006) 39 Cal.4th 398                                                        21

19 *People v. Rios*
   (2000) 23 Cal.4th 450                                                        21
20
   *Rivera v. United States*
21 318 F.2d 606 (9th Cir. 1963)                                                 18

22 *Roehler v. Borg*
   945 F.2d 303 (9th Cir. 1991)                                                 17
23
   *Taylor v. Stainer*
24 31 F.3d 907 (9th Cir. 1994)                                                  17

25 *U.S. v. Jimenez-Ortega*
   472 F.3d 1102 (9th Cir. 2007)                                                17
26
   *United States v. Arias-Villanueva*
27 998 F.2d 1491 (9th Cir. 1993)                                                17

28

**TABLE OF AUTHORITIES  (continued)**

| | Page |
|---|---|
| *United States v. Buffington*<br>815 F.2d 1292 (9th Cir. 1987) | 21 |
| *United States v. Free*<br>841 F.2d 321 (9th Cir. 1988) | 17 |
| *United States v. Labrada-Bustamante*<br>428 F.3d 1252 (9th Cir. 2004) | 21 |
| *United States v. Santana*<br>175 F.3d 57 (9th Cir. 1999) | 17 |
| *United States v. Vigil*<br>989 F.2d 337 (9th Cir. 1993) | 17 |
| *Woodford v. Visciotti*<br>537 U.S. 19 (2002) | 16 |
| *Wright v. West*<br>505 U.S. 277 (1992) | 17 |

**Statutes**

| | |
|---|---|
| United States Code, Title 28<br>    § 2254(d)(1) | 16 |
| California Penal Code | |
|     § 21 | 21 |
|     § 187, subd. (a) | 1, 21 |
|     § 188 | 21 |
|     § 189 | 21 |
|     § 273a(a) | 1 |
|     § 12022(b)(1) | 1 |

**Other Authorities**

| | |
|---|---|
| Antiterrorism and Effective Death Penalty Act of 1996 | 16, 18 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  SHARON G. BIRENBAUM
   Deputy Attorney General
6  State Bar No. 94925
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-3664
    Telephone: (415) 703-5870
8   Fax: (415) 703-1234
    Email: sharon.birenbaum@doj.ca.gov
9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14  JORGE A. PANTOJA,                         C 07-3572 CRB

15                          Petitioner,       **MEMORANDUM OF POINTS
                                              AND AUTHORITIES IN
                                              OPPOSITION TO PETITION
16       v.                                   FOR WRIT OF HABEAS
                                              CORPUS**
16  K. PROSPER, Warden,

17                          Respondent.

18

19

20               **STATEMENT OF THE CASE**

21        On January 22, 2002, the Humboldt County District Attorney filed an information charging

22  petitioner with the murder of Maria Montero (Cal. Pen. Code, § 187(a), Count 1) in which he

23  personally used a deadly or dangerous weapon (a knife) within the meaning of section 12022(b)(1),

24  and child endangerment (Pen. Code, § 273a(a), Count 2). ACT 257-258.[1/] On November 18, 2002,

25  _____

26        1. All references are to the California Penal Code unless otherwise specified. "ACT" refers
    to relevant portions of the clerk's transcript on appeal from petitioner's first trial, case number
27  A101223, lodged with this Court as Exhibit A. "CT" refers to the clerk's transcripts of petitioner's
    second state court trial, lodged with this Court as Exhibit B. "RT" refers to the reporter's transcripts
28  of petitioner's state court trial, lodged with this court as Exhibit C.

    Mem. of Points and Authorities In Opposition To Pet. For Writ of Habeas Corpus - *Pantoja v. Prosper*-C 07-3572 CRB

                                    1

1  the jury found petitioner guilty of first degree murder and child endangerment, and found that

2  petitioner personally used a knife in commission of the murder. ACT 546-552. Petitioner appealed,

3  and on September 7, 2004, the California Court of Appeal reversed petitioner's conviction based on

4  evidence it found erroneously admitted under *Crawford v. Washington*, 541 U.S. 36 (2004), which

5  was decided after petitioner's first trial. *People v. Pantoja*, 122 Cal.App.4th 1, 16 (2004).

6      On November 7, 2005, petitioner waived jury trial, and a court trial began. CT 62, 66.

7  On December 21, 2005, the trial court found petitioner guilty of second degree murder and that he

8  personally used a deadly weapon in committing the offense. The trial court found petitioner not

9  guilty of child endangerment. CT 98-99. On February 2, 2006, the trial court sentenced petitioner

10  to a total prison term of 16 years to life. CT 101. Petitioner appealed. Exhs. D, E, and F. On

11  February 28, 2007, the Court of Appeal affirmed the judgment. Exh. G.

12      On May 9, 2007, the Supreme Court denied petitioner's Petition for Review. Exhs. H, I.

13      Petitioner filed the instant petition on July 11, 2007.

## STATEMENT OF FACTS

15      On August 30, 2001, Star Bakas was at home at her apartment at Ninth and N Streets in

16  Eureka. 1 RT 190. She was in her office working on a home study course in medical transcripts.

17  1 RT 190. She had ingested some marijuana at about 9 a.m. and had one beer sometime before noon.

18  At about noon, after she had been working for two hours, she got up to take a break. 1 RT 191. She

19  looked out her bedroom window and saw her neighbor Maria Montero and her three year old

20  daughter (Kenia) walking over to their mailbox. She then saw them walking back from the

21  mailboxes toward their apartment. 1 RT 192-193. Bakas went back to her studies. (1RT 193.

22      About three minutes after seeing Montero and her daughter getting the mail, Bakas heard

23  "horrendous screams." 1 RT 193-194, 219. She knew it was Montero because there was no one else

24  around. Bakas ran to Montero's apartment. 1 RT 193-194. It just took her about a minute to get

25  there. 1 RT 222. She heard some more screams as she was going to the apartment, but about

26  halfway there, she no longer heard any screams. 1 RT 195.

27      The door to Montero's apartment was ajar. 1 RT 194. When Bakas banged on the door,

28  it opened. 1 RT 195. Petitioner was lying down on the floor in front of the door holding a butcher

1  knife, facing Bakas. Montero was on the floor with her back against the couch, and appeared to be

2  dead. Kenia was behind her mother. 1 RT 196-197, 199. Petitioner began to sit up. Bakas did not

3  see any injuries on him. Petitioner was wearing a t-shirt, and Bakas did not see any blood on it. He

4  was holding the knife to his throat, and there was just a minor, trickling injury to the throat.

5  Petitioner did not say anything. 1 RT 197-198, 223, 225.

6        Bakas ran to her landlord's apartment, which was about 12 to 15 feet away, banged on the

7  door and screamed, "Call 911. He's killed the wife. There's a baby inside." 1 RT 199-200.

8  However, no one was there. She ran back to Montero's apartment, yelling, "Somebody call 911."

9  1 RT 200-201. The door to Montero's apartment was still open. Montero and Kenia had not moved,

10  but petitioner was now sitting up. 1 RT 201. He was cutting his throat with the knife, and the injury

11  was much more severe; there was massive bleeding from his throat. She saw no injuries other than

12  injuries on his neck. 1 RT 202-203, 226. Petitioner took the knife from his throat and pointed it at

13  his stomach area. 1 RT 227. Bakas screamed "no" a couple of times. Petitioner did not respond.

14  He seemed "blank" and laid back down. Bakas called for Kenia to come to her. Kenia looked

15  frightened and did not move at first, but after about a minute, came to her. 1 RT 204-205, 228.

16        Bakas picked Kenia up, took her outside, and sat on a rock in front of the apartment. 1 RT

17  206-208.   Another neighbor, Ryan Cowell, had come out, looked into the apartment, and called

18  911. 1 RT 208-209. Cowell stayed outside with Bakas and Kenia until police arrived. The police

19  suggested Bakas take Kenia to the neighbor's apartment to watch cartoons. 1 RT 210-211. At that

20  point, Bakas noticed a lot of blood splatters on Kenia's clothes and face, but no injuries. 1 RT 211.

21  Kenia asked Bakas, "Why did my daddy hurt my mommy?" She would not let go of Bakas until

22  someone from Child Protective Services arrived, and she vomited. RT 212.

23        Montero and petitioner's daughter, Kenia Vasquez, who was seven years old at the time

24  she testified, lived in an apartment with her mother in 2001. 1 RT 272-273, 281. There was only

25  one door to get into the apartment. 1 RT 274. The last time she saw her mother they had gone

26  grocery shopping at Winco. Her mother put the groceries in the car trunk and they drove home. 1

27  RT 274-275. When they first got back to the apartment, there was no one there. She did not see

28  petitioner come into the apartment; he did not knock. They went into the apartment and suddenly

1   petitioner was there. Kenia could not remember where she was when petitioner came in, but her

2   mother was in the kitchen. Petitioner had a knife in his hand and he cut her mother on her chest and

3   belly. 1 RT 276, 287. Her mother had not said anything to petitioner before he cut her, and

4   petitioner had not said anything to her mother. Her father "slammed" her mother into the couch.

5   1 RT 277. Kenia hid in the closet because she did not want to see. When she came out of the closet,

6   her mother (Montero) was lying still on the couch. Kenia did not know what the blood was; she got

7   a shirt and wiped her mother. She did not know where petitioner was when she did this. 1 RT 278.

8          According to Kenia, her mother never had the knife. If someone said that her mother

9   found the knife and gave it to petitioner, it would not be the truth. Her mother never said anything

10  to petitioner about hurting him; her mother did not have time to say anything. 1 RT 279. Kenia did

11  not remember seeing the police, throwing up, or watching cartoons in someone else's apartment.

12  1 RT 293. Kenia denied that anyone told her what happened to her mother or how she was supposed

13  to tell the judge what happened; her adoptive parents just told her to tell the truth. 1 RT 292.

14         Eureka Police Sergeant Mike Johnson and Officer Tim Jones were the first officers to

15  arrive at Montero's apartment. They arrived at the scene at 12:42 p.m.. 1 RT 136, 138, 142.

16  Petitioner was lying on his back in the middle of the living room floor in a puddle of blood,

17  attempting to stab himself in the neck with a knife. 1 RT 137. Sergeant Johnson drew his gun and

18  ordered petitioner to drop the knife. He stepped on petitioner's arm, and then kicked the knife away

19  from him. 1 RT 138-139. The knife was secured as evidence. 1 RT 140, 143-144.

20  Sergeant Johnson saw a female about five feet behind and to the left of petitioner. She was on her

21  knees, leaning back against the couch. She was not moving. 1 RT 140-141.

22         Eureka Police Officer Bryan Franco collected evidence from the scene. 1 RT 153-154.

23  He recovered a wallet from a shelf in the living room with indicia belonging to Montero. There was

24  a receipt from Winco Foods, date and time stamped August 30, 2001, 12:09 p.m. 1 RT 156. In the

25  trunk of a Silver Toyota Camry, Officer Franco found groceries in brown Winco bags with items

26  matching the receipt found in Montero's wallet. 1 RT 156-157, 173-175. He videotaped the scene.

27  1 RT 160. The tape showed a knife on the kitchen counter that resembled the knife petitioner had

28  been holding. 1 RT 165-167.

1    The videotape of the scene showed a partition next to the couch and a dresser with

2    drawers. There were numerous vanity items on the dresser, and nothing was knocked over. The

3    kitchen had normal clutter; there did not appear to have been a struggle there. Nothing was knocked

4    out of place on the shelves across from the couch, where the wallet was found. There was no sign

5    of a struggle. 1 RT 179-180. There was blood on the wall near the corner of the couch. There was

6    no other castoff or flung blood in any other area. There was no blood in the bedroom. There was

7    some blood on the kitchen floor, but none on the cabinets or table. 1 RT 180-181.

8    Chief forensic pathologist Mark Super did an autopsy on Maria Montero on September

9    1, 2001. Cause of death was multiple stab wounds. 1 RT 28. Montero suffered well over two dozen

10    wounds. 1 RT 30. There was a cluster of large stab wounds on the left upper chest. 1 RT 40.

11    Several of the wounds suffered by Montero would have been fatal alone. 1 RT 30. One was a large

12    gaping wound in the upper right breast which penetrated the right lung. Another penetrated the right

13    side deep into the chest cavity. A third wound was over the right breast bone, which went through

14    the sac around the heart and penetrated the heart. A fourth potentially fatal wound was to the left

15    of the breast bone, cutting the costal cartilage. 1 RT 32, 47-48. The fifth lethal wound was to the

16    upper middle abdomen which cut part of the sternum and went into the abdominal cavity, cutting the

17    stomach and penetrating the liver. A sixth wound also struck internal organs. 1 RT 33. Montero

18    suffered a single knife wound on the mid back, striking the spine. It hit the bone, protecting the

19    spinal cord, so it alone would not have incapacitated her. 1 RT 69-70.

20    Dr. Super retrieved the tip of a knife embedded in Montero's upper left arm bone. 1 RT

21    34, 49. It was consistent with Montero having her arms out or in front trying to defend against the

22    knife attack. 1 RT 50. One of Montero's ribs was cut by the knife. 1 RT 35-36. The knife

23    introduced into evidence as Exhibit 1A (a large butcher knife with a wooden handle, a broad single

24    edged blade, with the tip broken) was consistent with causing all of these wounds. 1 RT 34-35.

25    Montero suffered so many superficial stabs or cuts that Dr. Super did not count them. He

26    explained that the wounds indicated that she was being assaulted by someone wielding a knife and

27    trying to ward off the blows by grabbing the knife or attempting to knock the arm away. He

28    characterized the small wounds, especially on the forearms and hands, as defensive wounds. 1 RT

1  37-38, 41, 51-52, 56-57. Many of the wounds on the fingers, palms, and knuckle of Montero's hands

2  were deep cuts, showing that Montero grabbed the knife. 1 RT 57, 59-60, 63-65, 67-69.

3  **Prior Incidents**

4       On April 23, 2001, Eureka Police Officer Curtis Honeycutt responded to Montero's

5  apartment in the early afternoon. There was an older female with Montero, as well as a man named

6  Herrera. 1 RT 85-87. He tried to talk to Montero but she only spoke Spanish and he only spoke

7  English. However, he could tell that she was upset – her voice was elevated, she seemed excited,

8  and she spoke in a hurried tone. 1 RT 88. He made arrangements to return later. 1 RT 88-89.

9       Officer Honeycutt returned about two hours later with Officer Reyna-Sanchez, who spoke

10  Spanish. 1 RT 89-90. At that time Montero was calmer. 1 RT 90. After this, the officers went to

11  an apartment complex on Third Street and talked to petitioner. Petitioner was detained, but not

12  arrested. 1 RT 91-92.

13       Eureka Police Officer Rodrigo Reyna-Sanchez was born in Mexico and Spanish was his

14  native language. 1 RT 100. He first had contact with Montero at about 6:00 p.m. on September 28,

15  2000, at Don Juan's Restaurant. 1 RT 98. He accompanied her to her apartment because she claimed

16  her ex-husband or boyfriend was there. When they arrived, petitioner was there. 1 RT 98-99.

17  Reyna-Sanchez told petitioner that Montero did not want him there and that he needed to leave.

18  Petitioner was concerned about being able to see his daughter if he and Montero were separated or

19  divorced. 1 RT 101. It was a casual conversation. Reyna-Sanchez focused on how the legal system

20  worked, and how custody and child visitation worked. Petitioner never claimed Montero had been

21  physically violent towards him and did not see any injuries on petitioner. 1 RT 101-102. Petitioner

22  had been drinking, but was not intoxicated. 1 RT 103. Petitioner agreed to leave. 1 RT 102.

23       On April 23, 2001, Officer Reyna-Sanchez  responded to Montero's apartment with

24  Officer Honeycutt to translate. 1 RT 103-104. After that, they contacted petitioner at his Third

25  Street apartment. Petitioner said went to Montero's apartment, they got into an argument, and he

26  drove by her apartment three times after the argument. He never said she was violent towards him,

27  and he said he was not violent towards her. 1 RT 104-105. Petitioner still expressed concern about

28  having the right to see his daughter because he and Montero were on the verge of separation, divorce,

1 and restraining order. 1 RT 105. Officer Reyna-Sanchez explained to petitioner how restraining

2 and custody orders worked, and that he would not lose his right to visit his child. Petitioner seemed

3 reassured. Petitioner had been drinking, but he did not express any difficulties with Montero about

4 his drinking. Nor was the subject of his drinking brought up with respect to visitation. 1 RT 106.

5      On August 26, 2001, Officer Reyna-Sanchez went to Montero's residence, where he met

6 with Montero and petitioner outside the apartment. They were having a verbal altercation, and he

7 ordered them to stop. He did not see any blows or any injuries. They both behaved once he showed

8 up. Petitioner told him that Montero was driving a car registered to him, and he knew she was not

9 licensed to drive. He was afraid she might get pulled over. Petitioner needed to be reassured he

10 would not be held responsible for any damages resulting from her driving the car. 1 RT 108-111.

11      Petitioner was intoxicated, and Officer Reyna-Sanchez gave him a ride back to his

12 residence. It was about 9:00 a.m. Petitioner was emotional – he was crying and upset because of

13 his concern about his right to see his daughter. 1 RT 111-112. Petitioner had been told that

14 Montero was getting a restraining order and did not want to be with him anymore, and he was

15 worried he would not be able to see his daughter if she got the restraining order. 1 RT 112-113.

16 When they got to petitioner's apartment, Officer Reyna-Sanchez again explained to petitioner how

17 custody agreements, visitation orders, and restraining orders worked. 1 RT 114-115. Officer Reyna-

18 Sanchez gave petitioner his card, and told him that he was available any time if petitioner wanted

19 to talk to him or if he had any questions. 1 RT 115. By the time Officer-Sanchez left, petitioner was

20 calm, and thanked him for explaining things to him. 1 RT 115-117.

21      Officer Reyna-Sanchez did not have any further contact with petitioner until the day

22 following Montero's death. He went to jail to interview petitioner, but petitioner stated that he did

23 not wish to talk without an attorney. 1 RT 117-119. In his contacts with petitioner and Montero,

24 Officer Reyna-Sanchez never heard Montero make any threats against petitioner or use bad language.

25 1 RT 134. He also never heard petitioner threaten Montero. 1 RT 135.

26      **The Investigation**

27      Elvia Saavedra, Montero's brother's sister-in-law, helped Montero with paperwork for a

28 restraining order against petitioner a day or two before Montero was killed. 1 RT 240-241, 243, 246.

1  Montero told her she was afraid of petitioner. 1 RT 244. The boxes on the form for child support

2  and custody were checked off. The trial court took judicial notice of the file in which a judicial

3  officer, on August 28, 2001, signed a temporary order pursuant to the Domestic Violence Prevention

4  Act, and filed it on August 29, 2001. The trial court took judicial notice of the dates, but made clear

5  it was not considering any documentation or declarations contained in or supporting the order, as

6  they would be hearsay. 1 RT 260-262. The day before Montero died, Saavedra went with Montero

7  to pay the sheriff to have the order delivered. 1 RT 262-263. The receipt from Humboldt County

8  Sheriff's Office was dated August 29, 2001. 1 RT 265-266.

9  　　　　After Montero's death, Officer Reyna-Sanchez and Detective Hubbard taped a

10  conversation with Carlos Cervantes. 3 RT 709. Cervantes said he went to Burger King with

11  petitioner the day before Montero was killed. Petitioner said he had been advised that Montero

12  started legal proceedings for child custody, and he was upset, nervous, and concerned about losing

13  his right to see his daughter. Petitioner said he was concerned about the possibility that he might do

14  something he might regret. 3 RT 710. Cervantes did not say he thought this meant that petitioner

15  was thinking of going to Mexico. Instead, Cervantes stated he assumed petitioner was concerned

16  that he might harm Montero. 3 RT 711, 714. Cervantes also said that petitioner expressed concern

17  that Montero might prevent him from seeing his daughter, and that he was sad. 3 RT 715-716.

18  Petitioner and Montero had threatened each other about taking the child to Mexico. 3 RT 716.

19  　　　　Carlos Pantojas Cervantes testified he was petitioner's cousin and confirmed he went to

20  Burger King with petitioner the night before Montero was killed. 2 RT 514-515. However, he

21  denied petitioner was upset and wanted to talk to someone. 2 RT 517-518. Petitioner did say that

22  he had a problem having to do with marriage to Montero, and he was sad about it. 2 RT 518, 3 RT

23  600. No matter what a police tape had on it, Cervantes insisted that petitioner did not say anything

24  about court papers. 2 RT 522, 3 RT 607. Cervantes denied that petitioner told him he was afraid

25  he would do something he would later regret. Instead, he claimed petitioner said he did not want to

26  do something that he would be sorry about later, which Cervantes speculated was referring to going

27  to Mexico. 2 RT 519, 3 RT 598. Cervantes claimed that when petitioner and Montero had

28  problems, sometimes he would go to Mexico or to his brother's in Phoenix. However, Cervantes

1  admitted it was a long time ago and he did not recall exactly what petitioner said. 2 RT 520-521.

2  Cervantes told petitioner that whatever he was going to do, to think about his daughter because she

3  needed him. 2 RT 521. Cervantes maintained that petitioner was calm; he was not crying and did

4  not say anything bad might happen. 3 RT 599-600. Cervantes denied that he was concerned about

5  Montero's safety after the conversation. 3 RT 601.

6      According to Cervantes, petitioner was concerned about money because his job did not

7  pay enough. Petitioner was feeling sad with all his problems and wanted to go elsewhere. 3 RT 607.

8  Cervantes did not recall if petitioner said that Montero was giving him grief about his drinking.

9  Petitioner did not talk a lot about his concerns with respect to Kenia. 3 RT 611.

10      The parties stipulated that the trial court could consider Cervantes's testimony at the

11  preliminary hearing. 3 RT 728. At that time, Cervantes testified that petitioner went to work the day

12  before Montero was killed, but told his foreman he felt sick. Petitioner borrowed Cervantes's car

13  to go home, and then picked him up after work. ACT 113-114[2]. They went to Burger King to eat.

14  ACT 114-115. Petitioner told him that he and Montero were separated, and that Montero was going

15  to get a restraining order and take his daughter away from him. He said that he would probably have

16  to pay child support. Petitioner felt hopeless. ACT 115. He denied he told Officer Sanchez that

17  petitioner said that he thought he might do something that he would later regret. Instead, he claimed

18  petitioner said, "I don't want to try and do something that I'll feel bad about later." ACT 117.

19  **Defense Case**

20      Petitioner was 33 years old at the time of trial. He was from Guadalajara, Mexico, came

21  to the United States in the early 1990's, and began living in Eureka in 1996. He met Montero in

22  March 1996, when he was 24 or 25 and Montero was 35 or 36 years old. They began living together

23  in June or July 1996. 3 RT 742-744. Kenia was born April 14, 1998. It was his first child and he

24  was excited. He took care of Kenia when Montero was working. 3 RT 744.

25      Petitioner separated from Montero in 2000. Petitioner and Montero had argued about

26  money, his drinking, and custody of Kenia. Petitioner went to Mexico from October 2000 to April

27

28      2. At the preliminary hearing, Cervantes's last named was spelled "Servantes." (ACT 111.)

Mem. of Points and Authorities In Opposition To Pet. For Writ of Habeas Corpus - *Pantoja v. Prosper*-C 07-3572 CRB

1  2001. While he was gone, Montero sent him letters, saying that she loved him and did not want to

2  be alone. When he returned to the United States, he first stayed with his brother and sister-in-law

3  in Arizona. 3 RT 745-748. He then returned to Eureka and tried to get back together with Montero

4  in May 2001. They had plans to move to Phoenix, which did not pan out. 3 RT 749. In August

5  2001, they separated again. Montero was upset with petitioner because of his drinking. 3 RT 750.

6      At some point, petitioner found out Montero had filed "papers" about Kenia. He talked

7  to his cousin about it at Burger King. Petitioner admitted that he told his cousin that he was afraid

8  he might lose control and do something he would regret. 3 RT 750, 773. Petitioner admitted that

9  he talked to Montero's sister-in-law the previous Sunday or Monday. She was taking care of Kenia,

10 but said Montero told her not to let petitioner see Kenia because she had filed for a restraining order

11 and child support. Petitioner was angry about not being able to see Kenia. 3 RT 773-775. However,

12 Officer Sanchez explained to him that even with a restrictive order, the court would make it possible

13 for him to see Kenia, even if he and Montero broke up. 3 RT 779.

14     The day after he talked to his cousin (the day Montero died), petitioner went to Montero's

15 apartment because he wanted to see Kenia and talk to Montero about her. 3 RT 750. When he got

16 to the apartment, the door was open and Montero was in the kitchen. Kenia was outside by herself

17 playing by the car. Petitioner denied that he had any weapons with him or that he went there to kill

18 Montero. 3 RT 750-751, 764-765.

19     He and Montero talked about Kenia. Petitioner said that he was sad and wanted to see

20 Kenia, but Montero told him that he was not going to see her anymore. Petitioner told Montero that

21 if he could not see Kenia, he did not want to live and he was going to kill himself. Montero told him

22 that if he had the "balls" to do it, to go ahead and do it. She told him to get the knife from under the

23 bed, and petitioner did so. He put the knife next to his chest, said he was going to kill himself,

24 started crying, put the knife on the television, and went to the bathroom, where he cried. 3 RT 751-

25 752. When he came out of the bathroom, Montero said, "Oh, you were saying about killing yourself

26 doesn't look like you have the guts to do that. . . . Do it and go and fuck your mother." 3 RT 752.

27 Montero gave him the knife, and he pointed it at his chest. Montero then pushed the knife against

28 him, and he felt some burning pain. Petitioner did not remember what happened after that. 3 RT

1    752-753. He did not remember stabbing Montero, although he understood that he did so. He denied

2    he knew Kenia was present. 3 RT 753-754. He did not remember cutting his own throat. 3 RT 755.

3        Petitioner told police afterwards that there was another man in Montero's life named

4    Ramone Garcia, and that Garcia "was guilty of this whole mess" because he did not respect the

5    house. 3 RT 757, 759, 761-762. Petitioner admitted that Garcia was on his mind the day he killed

6    Montero, and that he was jealous of him. However, he maintained that he was not angry or

7    concerned that Garcia would replace him as Kenia's father that day because Montero was no longer

8    living with Garcia. 3 RT 760. According to petitioner, he had been at the apartment about five

9    minutes when he first got the knife and went to the bathroom. He was in the bathroom less than a

10    minute. When he came out of the bathroom, he and Montero continued to have a conversation.

11    Montero said she would not let him see Kenia, and insulted his mother. 3 RT 771-772.

12        Jose LaCalle, a cross-cultural forensic psychologist, interviewed petitioner three times –

13    once in 2001, and twice in 2002. He also interviewed members of petitioner's family and friends

14    in Eureka, Arizona, and Guadalajara, Mexico. 2 RT 301, 306-308. Dr. LaCalle gave petitioner a

15    Spanish intelligence test, and determined that his IQ was between 74, which is borderline mentally

16    retarded, and 80, which is the lower range of normal. 2 RT 310-312. Dr. LaCalle acknowledged that

17    he was critical of the IQ test he gave petitioner, but stated it was the best available at that time,

18    although it is no longer used. 2 RT 310-311. Dr. LaCalle went to petitioner's hometown in Mexico,

19    and learned that petitioner was a "dismal" student. His family indicated that petitioner was not very

20    clever. 2 RT 313-314. Family and friends in Mexico told Dr. LaCalle that petitioner's father liked

21    petitioner's older brother, Ruiz, better than petitioner. Indeed, he had a pronounced dislike of

22    petitioner because he was "dumb" and did not follow orders. Petitioner was aware of his father's

23    preference. 2 RT 314. Petitioner's father and uncles had a prosperous business processing coconut

24    meat, and everyone in the family worked there. They were considered middle class by Mexican

25    standards. However, they eventually had to close the business because a large business moved in.

26    Everyone in the family able to do so came to the United States, including petitioner. 2 RT 315.

27        Petitioner's family described him as quiet, socially inept, and prone to depressions. He

28    had a more difficult and problematic childhood than the other children in the family. He was

Mem. of Points and Authorities In Opposition To Pet. For Writ of Habeas Corpus - *Pantoja v. Prosper*-C 07-3572 CRB

11

1  emotional, had uneven and unexpected emotional reactions, and cried like a woman. 2 RT 317-319.

2  Nevertheless, Dr. LaCalle admitted his parents said petitioner was well loved and cared for during

3  his childhood, and there was no history or physical abuse, molestation, or neglect. 2 RT 370-371.

4  Petitioner dropped out of school when he was in eighth grade. However, this was better than most

5  children of his age in Mexico who do not even finish primary school. After his father's business

6  failed, he worked in construction and then came to the United States. 2 RT 320-321, 382-383.

7       Petitioner suffered from periods of depression and turned to alcohol. 2 RT 323-324. In

8  Dr. LaCalle's opinion, petitioner had a very explosive, emotionally labile personality, with signs of

9  paranoid ideation with respect to women, of whose actions and motives he was always suspicious.

10  He was allegedly seduced by his uncle's wife when he first came to the United States and lived with

11  them in Los Angeles. This made him have great mistrust of women. He also was very obsessive.

12  2 RT 323, 332-333. Although petitioner had a very tumultuous relationship with Montero, he was

13  neurotically obsessed with her. He transferred this obsession to his child, who filled a vacuum in

14  his life. 2 RT 329-330, 333, 335. He was not going to let anything keep him from seeing the child,

15  including a restraining order. 2 RT 335.

16       Petitioner's concern about not being able to see his child grew stronger in August 2001.

17  According to Dr. LaCalle, the threat of not being able to see his daughter was what ultimately

18  provoked the homicide. Petitioner said that he had been in turmoil for four days before killing

19  Montero; he could not sleep, was drinking heavily, and had been using methamphetamine. Petitioner

20  said that he was "loco" (crazy). He said he would rather be dead than not see his daughter, which

21  showed a neurotic attachment to the daughter. Dr. LaCalle asserted this could result in acting

22  irrationally without consideration of the consequences. 2 RT 337-339, 349-351.[3/]

23       The first time Dr. LaCalle talked to petitioner in 2002, petitioner said that the day of

24  Montero's death, he went to see her so he could visit his daughter. Montero told him to get out of

25  her life, she had another man, and he was never going to see his daughter again. Petitioner had a

26

27

---

28       3.    Dr. LaCalle acknowledged that after petitioner was arrested, no alcohol or methamphetamine were found in his system. 2 RT 511-512.

1   very powerful emotional reaction, and threatened to kill himself. 2 RT 361-362. Montero got angry

2   and said that he had no "balls," and that if he was going to kill himself, he should just do it.

3   Petitioner started to cry. He was ashamed of crying so he ran into the bathroom. Montero began

4   insulting him through the door. Petitioner came out of the bathroom, and again threatened to kill

5   himself. Montero gave him a knife, laughed at him, told him he had no balls, and to "go fuck your

6   mother," which was the ultimate insult. Petitioner pointed the knife at his chest. Montero pushed

7   him a couple of times, causing him to stab himself twice. 2 RT 362-363, 432-435. He became

8   furious and went for her. He could not remember what happened after that. 2 RT 363, 435-436.

9   He did not know his daughter was there until the neighbor lady shouted. 2 RT 436.

10          When LaCalle interviewed petitioner a second time in 2002, petitioner told a similar story,

11   except he said that he got the knife from under Montero's bed. 2 RT 440-442, 444. In the first

12   interview he said he remembered pushing Montero on the couch, but not in the second interview.

13   2 RT 445. Petitioner also said that Montero told him she did not love him anymore, and that she had

14   another man, "Ramone Lopez Garcia." 2 RT 448.

15          In Dr. LaCalle's opinion, the description of the wounds and locations of the wounds on

16   Montero indicated a "rage-type" assault, brought on by insults, threats, culturally unacceptable

17   insults toward his mother, the realization that there was another man in Montero's life, and the

18   possibility of having Kenia taken away. 2 RT 466-468, 483, 492. He acknowledged that it also

19   suggested a purpose to kill as well as rage. 2 RT 471.

20          Dr. LaCalle recognized that petitioner was a very jealous man, and that he was jealous of

21   Ramone Garcia in particular. He was also upset Montero was trying to get a restraining order. 2 RT

22   398-399, 505. Dr. LaCalle talked to Cervantes, who said that petitioner was angry about this, and

23   said that she was not going to keep his daughter from him. 2 RT 400-401, 411. Petitioner also told

24   Dr. LaCalle that he knew there was a restraining order preventing him from going to Montero's

25   house, but that he went anyway because he wanted to see his daughter. 2 RT 411-412.

26          Montero's son, Jose Luis Vasquez, testified that after Montero's death, he cleaned her

27   apartment and found two knives under the bed. (3 RT 614, 620-621. The knives under the bed were

28   not like the knife used to kill Montero. He recalled that there was a set of knives with black handles

Mem. of Points and Authorities In Opposition To Pet. For Writ of Habeas Corpus - *Pantoja v. Prosper*-C 07-3572 CRB

13

1  on the kitchen counter. 3 RT 619-620.

2       Petitioner's sister-in-law Alma Pantoja was married to petitioner's older brother and lived

3  in Phoenix. She had known petitioner since he was 17. 3 RT 623-625. Petitioner was shy and had

4  a hard time talking to people or telling them his problems. 3 RT 625. Petitioner stayed with her in

5  Phoenix in 1999 and 2001 when he was separated from Montero. Petitioner was depressed and sad

6  about the separation. 3 RT 628. Petitioner loved and adored Kenia; she was "all his life." 3 RT

7  627. When petitioner could not see Kenia, he became very sad and depressed. 3 RT 632.

8       Petitioner's sister Erika Pantoja Castellanos testified that when petitioner and Montero

9  argued, petitioner would come to live with her. He did not tell her what they were arguing about.

10  Sometimes petitioner brought Kenia, who he loved a lot. 3 RT 648-651. Petitioner was living with

11  her the week before Montero was killed. He seemed depressed, cried, would not talk, and slept a

12  lot. 3 RT 652-654. She and petitioner had different work schedules during that time, so she did not

13  see him very often. 3 RT 655-56. She was aware that petitioner had a drinking problem which

14  bothered Montero. 3 RT 657.

15       Forensic pathologist consultant Harry Bonnell reviewed the report and photos from

16  Montero's autopsy, petitioner's medical records, and the transcript of his previous testimony.

17  Defense counsel gave him a synopsis of what happened. 2 RT 530, 535. Dr. Bonnell noted that the

18  tip of the knife used in the assault had broken off in Montero's arm bone. 2 RT 536-537. Based

19  on the photos of petitioner's wounds, Dr. Bonnell opined that petitioner's chest wounds were made

20  by an object with a sharp point, consistent with the knife before the tip broke off. 2 RT 540-542.

21  Petitioner's superficial abdominal wounds appeared to have a squared off margin. He believed that

22  if the same knife was used, it had been damaged and the tip of the knife was curled back. 2 RT 544-

23  545. He noted that his opinion was based on a medical probability (more likely than not), and not

24  a medical certainty. 2 RT 542.

25       However, on cross-examination, Dr. Bonnell acknowledged that his opinion that the knife

26  tip was bent back was based on the photo of the knife – he had not seen the actual knife. In fact, the

27  tip of the actual knife was not bent back. 2 RT 551-552, 554-555. Dr. Bonnell stated that the

28  appearance of the knife in the photograph did not match the appearance of the physical exhibit. 2

1   RT 557-560. He admitted that if the tip of the knife recovered at the autopsy lined up with the knife

2   in evidence, he misinterpreted the photograph. 2 RT 561. The prosecutor lined up the tip and knife

3   in evidence, and Dr. Bonnell admitted that they matched. 2 RT 563-564. Dr. Bonnell further

4   admitted that even with the broken tip, the knife still had a good tip on it. 2 RT 565-566. With

5   respect to Montero's wounds, Dr. Bonnell stated most were too distorted to determine if they were

6   made by the knife with or without the tip, except for the back wound, which he believed was with

7   the tip. 2 RT 574-576. He acknowledged knife wounds are hard to reconstruct. 2 RT 579.

8        Department of Justice criminalist Kay Belschner received clothing from Kenia, petitioner

9   (sweat pants and shoes), and Montero (pants, top, and bra). There was also a red top whose source

10  was in question, although it was listed as coming from Kenia. She did not receive a shirt from

11  petitioner. 3 RT 665-668. She examined the clothes in July and August 2002. 3 RT 669.

12       Petitioner's sweatpants had heavy staining in front. There were smears, wipes, and spatters

13  that primarily went downward, many towards the inseam on the left leg. All of the stains on his

14  pants were his own blood type. 3 RT 670-672. Belschner explained that the cause of downward

15  blood spatter is either from a wound above the spatter, or being flung off an object from above. 3

16  RT 672-673. The downward momentum suggested that petitioner was standing, or at least in an

17  upright position. 3 RT 673, 700. Belschner also believed the stains were more likely from the neck,

18  rather than the chest, wounds since the neck wound was open and bleeding without any covering,

19  and the pants contained body material like fat. 3 RT 691-693.

20       All the blood on petitioner's left shoe belonged to him. On the back of his right shoe, there

21  were four downward drops – three were from petitioner and one was from Montero. Many stains

22  on the shoes were heavy downward drops, coming from above. This was consistent with the person

23  standing at the time. 3 RT 674-676, 685.

24       There was one stain on Montero's pants from petitioner just below the knee area of her left

25  leg, going downwards toward the seam. It was small and had castoffs, so Belschner believed it was

26  flung, either from a knife or a finger. 3 RT 676-678. It was consistent with Montero being vertical,

27  and unlikely she was lying down horizontally. 3 RT 679-680. Montero also could have been down

28  with the knee bent. Belschner explained that the stain indicated the leg was in a vertical orientation

1   as opposed to being absolutely flat. 3 RT 688, 707. She believed it was unlikely that the blood on

2   Montero's pants came from the chest wound, although it was not impossible. 3 RT 696.

3          Belschner expected to find a significant amount of Montro's blood on petitioner's pants,

4   but she did not. 3 RT 680. However, she did not analyze all the blood on his pants. 3 RT 682.

5   Belscher did not find any of petitioner's blood on Montero's top, or the back of her pants. 3 RT 687.

6                              **STANDARD OF REVIEW**

7          This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

8   (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and

9   "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537

10  U.S. 19, 24 (2002) (per curiam). Under AEDPA, the federal court has no authority to grant habeas

11  relief unless the state court's ruling was "contrary to, or involved an unreasonable application of,"

12  clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A decision constitutes an

13  unreasonable application of Supreme Court law only if the state court's application of law to the

14  facts is not merely erroneous, but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75

15  (2003). The petitioner bears the burden of showing that the state court's decision was unreasonable.

16  *Visciotti*, 537 U.S. at 25.

17                                  **ARGUMENT**

18
       **THE STATE COURT REASONABLY FOUND THERE WAS
19     SUFFICIENT EVIDENCE OF MALICE TO SUPPORT THE SECOND
       DEGREE MURDER CONVICTION**
20

21         Petitioner's sole claim is that there was insufficient evidence of malice to sustain his

22  conviction for second degree murder. The state court's rejection of his claim was not "contrary to"

23  or "an unreasonable application of" clearly established Supreme Court precedent.

24  **A.   Law On Sufficiency Of Evidence**

25         In determining whether the evidence sufficiently supports a conviction, the "relevant

26  question is whether, after viewing the evidence in the light most favorable to the prosecution, *any*

27  rational trier of fact could have found the essential elements of the crime beyond a reasonable

28  doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The government can

1   prove the crimes by either direct or circumstantial evidence, or by any combination of the two.

2   *United States v. Santana*, 175 F.3d 57, 62 (9th Cir. 1999); *United States v. Free*, 841 F.2d 321, 325

3   (9th Cir. 1988) (elements of first degree murder can be established by circumstantial evidence and

4   inferences drawn therefrom). A federal habeas court must presume that the trier of fact resolved any

5   conflicts in the evidence in favor of the prosecution and defer to that resolution. *Jackson v. Virginia*,

6   443 U.S. at 326; *United States v. Santana*, 175 F.3d at 62; *McMillan v. Gomez*, 19 F.3d 465, 469 (9th

7   Cir. 1994).

8          The *Jackson* standard "does not permit a court to make its own subjective determination

9   of guilt or innocence . . . ." *Jackson*, 443 U.S. at 319-320 n. 13. Nor does the habeas court "have

10  the juror's right to weigh the evidence." *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991). The

11  question is not whether the reviewing court is convinced beyond a reasonable doubt of the

12  petitioner's guilt. "It is whether rational jurors could reach the conclusion that these jurors reached."

13  *Id.*; *accord Payne v. Borg*, 982 F.2d 335, 338-339 (9th Cir. 1992). It is well-settled that the

14  prosecution's evidence need not exclude every reasonable hypothesis consistent with innocence in

15  order to satisfy the standard of *Jackson v. Virginia. See United States v. Arias-Villanueva*, 998 F.2d

16  1491, 1503 (9th Cir. 1993), overruled on other grounds in *U.S. v. Jimenez-Ortega*, 472 F.3d 1102,

17  1104 (9th Cir. 2007). It is the trier of fact's function to weigh the evidence and resolve conflicts in

18  the testimony. *Roehler v. Borg*, 945 F.2d at 306; *see also United States v. Vigil*, 989 F.2d 337, 340

19  (9th Cir. 1993). Those conflicting inferences are resolved in favor of the prosecution, not the

20  defendant, and a habeas court must defer to that resolution. *McMillan v. Gomez*, 19 F.3d at 468-69.

21  "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must

22  presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any

23  such conflicts in favor of the prosecution, and must defer to that resolution.'"  *Taylor v. Stainer*,

24  31 F.3d 907, 909 (9th Cir. 1994) citing *Wright v. West*, 505 U.S. 277 (1992), *Jackson v. Virginia*,

25  443 U.S. at 319.

26         A writ of habeas corpus may be granted "only if 'the charges against petitioner were so

27  totally devoid of evidentiary support as to render his conviction unconstitutional under the Due

28  Process Clause of the Fourteenth Amendment.'" *Myers v. Rhay*, 577 F.2d 504, 511 (9th Cir. 1978),

1 │ *cert. den.* 439 U.S. 968 (1978); see also, *Rivera v. United States*, 318 F.2d 606, 607-08 n. 2 (9th Cir.

2 │ 1963) (absent "exceptional circumstances" objection to sufficiency of evidence is not grounds for

3 │ habeas corpus relief). Under the AEDPA, the question is whether the state court's application of the

4 │ *Jackson* standard was reasonable. *Juan H. v. Allen*, 408 F.3d 1262, 1274-1275 (9th Cir. 2005).

5 │ **B.   The State Courts' Opinions**

6 │        Petitioner waived jury trial, opting for a court trial. As a result, the trial court explained

7 │ its finding of second degree murder:

8 │        First, let me say that this was a brutal, bloody, and senseless killing. It's another sad
   │ example of the toll of domestic violence in our community.

9 │        I would announce my verdict in the same fashion that I have considered it. First of
10 │ all, considering the issue of first-degree murder or murder with malice aforethought,
   │ premeditation, and deliberation.

11 │        Critical in my evaluation of this particular case – and I'll discuss this further – is the
   │ fact that this was a confrontation that was created by Mr. Pantoja. He went to Ms.
12 │ Montoya's (*sic.* [a]partment with an intent, with a purpose. And there certainly is some
   │ evidence that would at least suggest premeditation and deliberation as to the killing;
13 │ however, I'm not convinced by that evidence beyond a reasonable doubt.

   │        More specifically and factually, the knife, I think, is critical. There's no evidence that
14 │ the knife is something that he brought to the apartment. How he acquired that knife, most
   │ reasonably I think, is at the apartment itself.

15 │        Specifically, I'd point to the fact that a similar knife is on the counter. In other
   │ words, the medium-size knife. This is the larger of those knives. So it appears that he
16 │ acquired the knife at the apartment.

   │        As I say, I think there is some evidence of premeditation and deliberation; however,
17 │ I'm simply not convinced of that beyond a reasonable doubt. So, therefore, I would find
   │ him not guilty of murder in the first degree.

18 │        I am convinced beyond a reasonable doubt that this was an intentional killing. And
   │ I don't think that either counsel dispute that fact. Clearly, it is an intentional killing.

19 │        And I – I would find further that Mr. Pantoja had the fully formed intent to kill Ms.
   │ Montoya (*sic*) which he carried out in a brutal fashion; and, likewise, he had the intent to
20 │ kill himself, which he carried out by slashing his own throat, his life being spared only by
   │ the quick action of the initial responders.

21 │        The real question here, and as I say has been well presented, is whether this
   │ intentional killing of another was with the requisite malice aforethought.

22 │        And as I noted, certainly a scenario has been presented by the defense, and I think
   │ that the evidence might support, a number of potential scenarios as to what actually
23 │ happened at the scene. But critical to me in considering this case was the fact that, as I
   │ indicated, this was a confrontation created by Mr. Pantoja. He had a reason to go to Ms.
24 │ Montoya's (*sic*) apartment that day. And, at a minimum, he had the intent to induce some
   │ form of action on the part of Ms. Montoya (*sic*) by whatever means that he had available.

25 │        First of all, I would find that, when he could not induce his (*sic*) sympathy or
   │ acquiescence by threats to kill himself, he was left with only one recourse; and that was
26 │ to kill her.

   │        I'm not convinced that Mr. Pantoja's assertion that Miss Montoya (*sic*) pushed the
27 │ knife into him when he threatened to kill himself. I'm not – I'm not convinced of that –
   │ of that particular fact.

28 │        So in other words, to lay out those facts as I understand them, Mr. Pantoja would
   │ have the Court believe that he went over to the apartment; that a knife in some fashion was

1   acquired. He would assert that Ms. Montoya (*sic*) handed him the knife and told him that,
2   if he wanted to kill himself, he should do so; that he placed the knife himself to his chest;
    and that she pushed him when he was unable to accomplish – accomplish the task himself.

3       I think that that particular scenario flies in the face of reason. The fact is that their
    daughter, Kenia, was in the apartment and that Ms. Montoya (*sic*) knew that their daughter
    was either in the apartment or nearby, having just arrived from the grocery store with her.

4       Mr. Pantoja apparently did not know that. I don't think that it is reasonable to believe
5   that Ms. Montoya (*sic*) would want Mr. Pantoja to kill himself in front of the infant or
    toddling daughter.

6       So, as I indicated, my finding is, more specifically, that this was a confrontation
    created by Mr. Pantoja to achieve a result. When he failed to achieve that result by
7   attempting to acquire her sympathy and threatening to kill himself, then the result that he
    desired, some acquiescence from her, some promise from her, some relief from her of
8   what he was tormented by, which is the dissolution of their relationship and the
    estrangement of his daughter, then he acquired that result by, as I say, the only recourse
9   that was available to him at that time which was to kill her. And I think that he fully
    formed that intent with premeditation – pardon me – with the requisite malice
    aforethought.

10      And, specifically, I would point to the fact that he stabbed her in the back. I –
11  frankly, Mr. Steinberg's witnesses – I think the witness was very convincing relative to
    the – the stabbing. The initial stabs to Mr. Pantoja being in the chest, apparently by a
12  sharp instrument; and, likewise, the witness testified that the stab in the back was by a
    sharp instrument, not by one that had been blunted by having been broken off by a bone.

13      So what the evidence indicates to me is that, when, as I say, Mr. Pantoja was unable
    to induce her sympathy or acquiescence by threats to himself, he turned the knife on her.
14  She had her back to him. He stabbed her in the back, and then the confrontation ensued,
    evidenced by the defensive wounds to Ms. Montoya (*sic*). And ultimately Mr. Pantoja
15  dispatched Ms. Montoya (*sic*).

16      So I do find that – beyond a reasonable doubt, that the defendant intentionally killed
    the victim with malice aforethought. He is, therefore, guilty of murder in the second
    degree pursuant to Penal Code section 187 subsection (a).

17      I also find, beyond a reasonable doubt – and there is very little controversy – that the
    defendant used a deadly weapon, a knife, in the commission of that particular felony
18  pursuant to Penal Code section 12022(b)(1).

19  RT 829-831.

20      The California Court of Appeal rejected petitioner's claim on appeal that there was no

21  substantial evidence to support the second degree murder conviction, and that the conviction should

22  be reduced to manslaughter because there was insufficient evidence of malice:

23      "California statutes have long separated criminal homicide into two classes, the
    greater offense of murder and the lesser included offense of manslaughter. The
24  distinguishing feature is that murder includes, but manslaughter lacks, the element of
    malice.... [¶] Malice exists, if at all, only when an unlawful homicide was committed with
25  the 'intention unlawfully to take away the life of a fellow creature' (§ 188), or with
    awareness of the danger and a conscious disregard for life [citations]. In certain
26  circumstances, however, a finding of malice may be precluded, and the offense limited to
    manslaughter, even when an unlawful homicide was committed with intent to kill. In such
27  a case, the homicide, though not murder, can be no less than voluntary manslaughter.
    [¶] On several recent occasions, we have explained the relationship between murder and
28  manslaughter, as applied to intentional and unlawful killings. "'Murder is the unlawful

killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of ... voluntary manslaughter. (§§ 192.)" [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills [nonetheless] lacks malice ... when [he] acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or ... kills in 'unreasonable self-defense'-the unreasonable but good faith belief in having to act in self-defense [citations]." [Citations.] [¶] These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by negating the element of malice that otherwise inheres in such a homicide [citation].'" ( *People v. Rios* (2000) 23 Cal.4th 450, 460, fns. & italics omitted.)

Defendant argues that his testimony established that he went to Montero's apartment to discuss custody arrangements, and not with the intention of harming Montero. He asserts that the physical evidence was consistent with his testimony in that the wounds to his upper chest appear to have been caused by a knife before its tip was broken-supporting his claim that Montero initiated the physical contacts that led to the killing. Finally, he relies on Belschner's testimony that the blood spatters "on Montero's pant leg [were] consistent with [his] testimony that he was stabbed by Montero while both of them were standing and facing each other. The spatter would not have been on Montero's pants if appellant had stabbed himself only after she was stabbed and was lying on the couch where her body was found."

In reviewing the sufficiency of the evidence, we must determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We "'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'""" ( *People v. Davis* (1995) 10 Cal.4th 463, 509.)

While there may be evidence that supports defendant's theory of the case, it is hardly conclusive. The trial court reasonably found, based on substantial evidence, that defendant was guilty of murder, not manslaughter. Kenia's testimony was that defendant attacked Montero without provocation, and Bakas's testimony that she heard screams very soon after seeing Montero and Kenia enter the apartment corroborate Kenia's account of the crime. Defendant attacks Kenia's credibility because she did not remember being removed from the apartment by Bakas. However, this goes only to the weight of her testimony, and "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) Belschner's testimony was not conclusive that defendant sustained his chest wound before he stabbed Montero. The single wound in Montero's back, the multiple wounds to her chest and abdomen, and the numerous apparently defensive wounds to her hands and arms support the inference of a conscious attempt to kill. There was also substantial evidence of motive supporting a finding of malice. Defendant was concerned that Montero would obtain custody of their daughter, and was jealous because he believed she was seeing another man. In short, while the evidence might have supported a finding that defendant acted on sudden provocation or on the unreasonable belief that he was defending himself, there was also substantial evidence that he acted with malice and was guilty of murder.

Exh. G at 8-10.

**C.    The State Court's Ruling Was Not Contrary To Or An Unreasonable Application Of Supreme Court Precedence**

The state court reasonably found abundant evidence to support the trial court's finding of malice to sustain the second degree murder conviction.  Under California law, "[m]urder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Such malice may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.  (§ 188.)  Murder that is committed with malice but is not premeditated is of the second degree.  (§ 189.)" *People v. Ramirez*, 39 Cal.4th 398, 464-465 (2006).

California defines manslaughter as "an unlawful killing in which  the defendant lacks malice."  See *People v. Rios*, 23 Cal.4th 450, 460 (2000).  The law recognizes certain circumstances in which malice may be negated, reducing an unlawful killing from murder to voluntary manslaughter.  A defendant who intentionally and unlawfully kills nevertheless lacks malice when he acts in a sudden quarrel or heat of passion, or in an actual, though unreasonable, belief in the need for self-defense.  See *People v. Rios*, 23 Cal.4th at 460-62.

Intent is manifested by the circumstances connected with the offense.  Pen. Code, § 21.  "A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors." *People v. Ferrell*, 218 Cal.App.3d 828, 834 (1990); see *United States v. Labrada-Bustamante*, 428 F.3d 1252, 1260 (9th Cir. 2004) ("Culpable intent can be inferred from the defendant's conduct and from the surrounding circumstances."); *United States v. Buffington*, 815 F.2d 1292, 1302 (9th Cir. 1987) ("It is permissible to infer intent from a defendant's conduct and the surrounding circumstances.").

Petitioner never disputed that he killed Montero or that the killing was intentional and unlawful.  See Exh. D at 14.  Instead, he argued below, and apparently here, that there was insufficient evidence of malice to justify the second degree murder conviction.  To support his argument, petitioner essentially reiterates his theory of the case presented at trial, based on his own testimony and the testimony of his own witnesses, that the killing was an unreflective rage after

1  Montero insulted him and pushed the knife into him.  He asserts that his testimony was
2  "uncontroverted."  He ignores the substantial evidence which contradicted his version of events.

3      The only person other than petitioner and Montero who was present during the attack was
4  three year old Kenia.  Kenia, who was seven at the time of trial, testified that the day her mother
5  died, she and her mother had arrived home after going grocery shopping at Winco.  When they first
6  arrived, no one else was at the apartment.  She did not recall how petitioner came into the apartment;
7  suddenly he was there.  Her mother was in the kitchen when petitioner came, and he had a knife in
8  his hand.  1 RT 276, 287.  Petitioner began cutting her mother, slamming her into the couch.  Before
9  the stabbing, Montero had not said anything to petitioner, and petitioner had not said anything to her
10  mother.  1 RT 277.  Kenia testified that her mother never had the knife, and never said anything to
11  petitioner about hurting him.  According to Kenia, her mother did not have time to say anything
12  before the attack.  1 RT 279.  This contradicted petitioner's claim of an extensive argument with
13  Montero, in which Montero told him to go ahead and kill himself, insulted petitioner, and pushed
14  the knife into him.  Hence it negated petitioner's assertion of provocation.

15      Kenia hid in the closet.  Afterwards, she did not know what the blood on her mother was;
16  she got a shirt and wiped her mother.  1 RT 278.  This was corroborated by Kay Belschner's
17  testimony that she received a red top whose source was in question, but was listed as coming from
18  Kenia.  3 RT 668.  As the state appellate court found, Star Bakas's testimony was consistent with
19  Kenia's.  Bakas was looking out the window when she saw Montero and Kenia returning home.  She
20  watched them go to their mailbox, and then walk in the direction of their apartment.  Bakas testified
21  that she heard the "horrendous screams" only about three minutes after seeing Montero and Kenia
22  at their mailbox.  1 RT 193-194, 219.  There was no evidence that Bakas heard any arguing before
23  hearing the screams.

24      While Bakas may not have been actually timing events, her testimony made clear that it
25  was a very short time between seeing Montero getting the mail and presumably being attacked, based
26  on the screams.  This was consistent with Kenia's memory that petitioner was suddenly there and
27  attacking her mother such that her mother did not have time to say anything.  It contradicted
28  petitioner's story of a more prolonged interaction with Montero, involving an argument over him

1  seeing Kenia, his threatening to kill himself, Montero telling him there were knives under the bed,

2  getting the knife, arguing further with Montero, crying and going to the bathroom, coming out and

3  arguing further with Montero, and Montero insulting him and pushing the knife into him.

4  Additionally, when Bakas entered the apartment, she did not see any blood on petitioner's t-shirt,

5  or any indication of a chest injury. This too negated petitioner's story of provocation.

6        As the state appellate court also found, there was abundant evidence of petitioner's motive

7  to kill Montero, which supported a finding of malice. Montero had obtained a temporary restraining

8  order against petitioner in which she also sought child support. The order was signed on August 28,

9  2001, and filed on August 29, 2001, the same day that Montero's receipt showed that she paid the

10  sheriff's office to have the order delivered. 1 RT 260-263, 265-266. This was the day before

11  petitioner killed Montero. Elvia Saavedra helped Montero with the paperwork for the restraining

12  order. Montero told Saavedra that she was afraid of petitioner. 1 RT 244. It defies reason that

13  Montero, who expressed fear of petitioner and went so far as to get a restraining order, would not

14  only invite petitioner into her home, but then give him a knife or direct him to the knives in her

15  home. It is also inconsistent with Montero's behavior on prior occasions when petitioner showed

16  up unwanted at Montero's home; on those occasions she called the police. (See 1 RT 85-92, 98-101,

17  103-105, 108-111.

18        Petitioner admitted that he was aware of the restraining order and was upset about it. 3

19  RT 750, 773-775. The night before killing Montero, he told his cousin, Carlos Cervantes, that he

20  was afraid he was going to lose control and do something he would later regret. Petitioner

21  acknowledged this conversation. 3 RT 750, 773. Petitioner also acknowledged that he was jealous

22  of Ramone Garcia, another man that Montero had been seeing. Indeed, after he was arrested, he told

23  police that the whole "mess" was Garcia's fault. 3 RT 757, 759, 761-762, 760. Despite the

24  restraining order, and despite understanding what it meant, petitioner consciously and deliberately

25  went to Montero's apartment.

26        The physical evidence supported a second degree murder conviction as well. Montero

27  suffered a single wound to the middle of her back. Petitioner did not explain how Montero got the

28  back wound. Logic dictates that if Montero had pushed the knife into petitioner, and petitioner

1  "went off" by stabbing her, there would be not be one single wound right in the center of Montero's

2  back. The remaining wounds were to her front, mostly centered around her chest and upper

3  abdomen. Five of the wounds in this area would have been fatal in and of themselves. 1 RT 30, 32-

4  33, 40, 47-48. The fact finder could reasonably infer a conscious determination to kill from this

5  evidence. The pathologist testified that the numerous wounds on Montero's hands and arms were

6  consistent with defensive wounds, including attempts to stop the attack by grabbing the knife blade.

7         Petitioner's experts were not conclusive. Dr. Bonnell was basing his opinions on

8  photographs. He admitted he misinterpreted the photograph of the murder weapon; in the

9  photograph it looked like it was bent, but in reality it was not. Moreover, he acknowledged that even

10  with the point missing, the knife's tip was still very sharp. He also acknowledged that of all the

11  wounds suffered by Montero (at least 30 major wounds), he could only give a more conclusive

12  opinion about the back wound, which he believed occurred before the tip was broken. Hence, his

13  conclusion that petitioner's chest wounds were made before the knife tip was broken off in

14  Montero's arm was suspect. Moreover, when Bakas first entered the apartment, she did not see any

15  blood on petitioner's t-shirt, and no indication of any chest injury. In any event, the trial court

16  reasonably concluded that petitioner might have threatened to kill himself by placing the knife at his

17  chest, but when it failed to get the result he wanted, he turned on Montero.

18         Although Belschner testified that the blood stain on Montero's pants was a downward

19  stain, and that it was consistent with Montero standing at the time, she explained that it only meant

20  that the pants were not completely horizontal when the stain occurred. Thus, Belscher agreed that

21  Montero could have been down on the ground with her leg bent before she passed out. She also

22  believed it more likely that the stain was from petitioner's neck, not chest. Moreover, given the

23  ferocity of the attack on Montero, and her apparent struggle indicated by the numerous defensive

24  wounds, it is hard to believe that, if petitioner had been stabbed in the chest before attacking

25  Montero, so little of his blood would be found on Montero.

26         Petitioner seizes on the trial court's finding that petitioner had not brought a knife to the

27  apartment, but instead obtained the knife there. 3 RT 828. This fact was crucial only in that it

28  created a reasonable doubt in the court's mind that the killing was premeditated; the court stated that

1    while there was certainly some evidence that suggested premeditation and deliberation, it was not

2    convinced beyond a reasonable doubt, based upon its determination that petitioner did not bring the

3    knife with him to the apartment. However, this did not negate the court's finding of second degree

4    murder. As the trial court noted, the smaller knife which was similar to the one used by petitioner

5    was sitting on the kitchen counter. Kenia testified that her mother was in the kitchen when petitioner

6    suddenly appeared and attacked her mother. The fact that petitioner may have seized the knife at that

7    point and attacked Montero does not negate an intentional, unprovoked killing.

8        The trial court noted that this was a confrontation sought by petitioner, who had reasons

9    to go to Montero's apartment. The evidence in fact showed numerous motives for petitioner to go

10   to Montero's apartment and kill her. He had just been informed she was obtaining a restraining order

11   which he worried would prevent him from seeing his daughter Kenia. She was also seeking child

12   support; petitioner's cousin Carlos Cervantes testified that the night before petitioner killed Montero,

13   petitioner was concerned about money because his job did not pay enough. 3 RT 607. Petitioner

14   was jealous of Montero's relationship with Ramone Garcia, who he blamed for the "mess" after his

15   arrest. Petitioner was upset about these problems, and told his cousin the night before killing

16   Montero that he was afraid he might lose control and do something he might later regret.

17       In sum, there was abundant evidence supporting an intentional, unprovoked killing.

18   Consequently, the charges against petitioner were not "so totally devoid of evidentiary support as

19   to render his conviction unconstitutional under the Due Process Clause of the Fourteenth

20   Amendment" (*Myers v. Rhay*, 577 F.2d at 511), and he is not entitled to habeas corpus relief.

21

22

23

24

25

26

27

28

1

**CONCLUSION**

2      WHEREFORE, respondent respectfully submits that the order to show cause should be

3 discharged, the petition for writ of habeas corpus denied, and this action dismissed.

4      Dated:  April 25, 2008

5                          Respectfully submitted,

6                          EDMUND G. BROWN JR.
                           Attorney General of the State of California

7                          DANE R. GILLETTE
                           Chief Assistant Attorney General

8
                           GERALD A. ENGLER
9                          Senior Assistant Attorney General

10                         PEGGY S. RUFFRA
                           Supervising Deputy Attorney General

11

12                         /s/ Sharon G. Birenbaum
                           SHARON G. BIRENBAUM
                           Deputy Attorney General

13                         Attorneys for Respondent

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28