IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORGE A. PANTOJA, )<br>)<br>Petitioner, )<br>)<br>vs. )<br>)<br>)<br>K. PROSPER, Warden, )<br>)<br>Respondent. )<br>_____ ) | No. C 07-3572 CRB (PR)<br><br>ORDER DENYING PETITION<br>FOR A WRIT OF HABEAS<br>CORPUS |

Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254 claiming insufficiency of the evidence. For the reasons set forth below, the petition is denied.

**STATEMENT OF THE CASE**

After a jury trial in the Superior Court of the State of California in and for th County of Humboldt, petitioner was found guilty first-degree murder for the killing of Maria Montero, child endangerment and using a deadly weapon in the commission of the killing. The California Court of Appeal reversed and remanded because the trial court erroneously admitted a declaration that Montero filed in support of an application for a restraining order against petitioner.

On remand, petitioner waived his right to a jury trial and the case was tried to the court. On December 21, 2005, the trial court found petitioner guilty of

second-degree murder and personally using a deadly weapon in committing the offense. On February 2, 2006, petitioner was sentenced to sixteen years to life in state prison.

On February 28, 2007, the California Court of Appeal affirmed the judgment of the trial court and, on May 9, 2007, the Supreme Court of California denied review.

On July 11, 2007, petitioner timely filed the instant petition for a federal writ of habeas corpus under 28 U.S.C. § 2254 claiming that there was insufficient evidence to support his second-degree murder conviction. Per order filed on November 15, 2007, the court found that petitioner's claim was cognizable under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer and petitioner has filed a traverse.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

> Star Lee Bakas, a neighbor of Montero, testified that on the day in question she was in her apartment studying. At approximately 9:00 a.m. she had smoked some marijuana and drunk a beer. Around noon, she saw Montero and Kenia, the then three-year-old daughter of Montero and defendant, "walking up the sidewalk of the apartments to check the mail." Bakas saw them return to their apartment, and approximately three minutes later heard "horrendous screams" coming from Montero and Kenia. She ran to Montero's apartment, knocked on the door and yelled to the landlord to "please call 911." It took her "a minute, maybe less" to get to Montero's apartment. The apartment door was ajar and it opened when Bakas banged on it. She saw defendant lying down with a knife, and Montero "on the floor with her back against the couch, and she appeared to be dead. And the little girl was behind the mother on the left-hand side of her, behind her shoulder." When Bakas opened the door, defendant started to sit up. She did not see any injuries on him at that time. She then went to the landlord's apartment, approximately 12 to 15 feet away, and "bang[ed] on the door screaming 'Call 911. He's killed the wife. There's a baby inside.' "When she received no response, she returned to Montero's apartment. Defendant was sitting up, holding the knife and cutting his throat. He

then held the knife to his stomach, but Bakas did not observe any bleeding from the stomach. Bakas called to Kenia, who looked frightened, and after about a minute Kenia left the apartment with her. Bakas noticed small splatters of blood on Kenia's clothes and face, but did not see any injuries on her.

Kenia was seven years old at the time of the second trial. She testified that on the day of the homicide, she and Montero went shopping. When they returned, no one else was in the apartment. Some time later, defendant arrived. Montero was in the kitchen, and Kenia saw defendant with a knife in his hand. She testified that he cut Montero on her chest and stomach. She did not recall Montero or defendant saying anything, but stated that defendant got Montero out of the kitchen and to the couch by "slamm[ing] her." While this was happening, Kenia hid in a closet. When she emerged, she saw her mother. Kenia testified that "I got a shirt. And I didn't know what the blood was, so I wiped her." She stated that Montero never held the knife. She was asked "Did your mom ever say anything to your dad about hurting him?" and replied, "No. She didn't have time to say anything." On cross-examination, Kenia testified that she could see through the closet door, and that she stayed in the closet until defendant had left.

Defendant testified that on the day of the killing he went to Montero's apartment to see Kenia. Montero was in the kitchen when he arrived and Kenia was outside in the car. He stated that he did not have a weapon with him and did not go to the apartment intending to kill Montero. He told Montero that "I was sad, and I wanted to see my daughter; and she told me that I was not going to see my daughter any more. . . I felt very badly because she is my daughter. . . I tell her that in that case what was the purpose of life if I didn't have my daughter. It didn't matter to me to be alive or not." He told Montero that he was going to kill himself. "She told me that if I had the guts to do it. . . She told me to get the knife from underneath the bed, and I went and got the knife from underneath the bed. . . I put it in my chest; and I tell her that if she was not going to let me see my daughter, I was going to kill myself. . . I started crying then with her. I left the knife on top of the TV, and I went to the bathroom. I was there crying. And so I came out and she say, 'Oh, you were saying about killing yourself, doesn't look like you have the guts to do that.' And she said, 'Do it and go and fuck your mother.' . . . She gave me the knife. I put it to my chest, and she just push it against me, and I don't remember any more what happened."

When interviewed by the police shortly afterwards, defendant told them "that there was another man in Maria's life[-]that his name was Ramone Garcia and he was guilty of this whole mess." The day before the homicide, defendant told his cousin that he had been told that Montero had applied for a restraining order and asked for child support. This upset defendant. Defendant admitted that the Sunday prior to the homicide, Officer Reyna-Sanchez had explained the restraining order process to him and "that the court would make it possible even if [he] and Maria broke up and never got back together, there was still a

3

process by which [he] could see Kenia."

A forensic pathologist testified that he found "well over two dozen" wounds on Montero's body, of which he isolated six, any one of which would have been fatal. He testified that he recovered the tip of a knife blade from Montero's upper left arm bone. "The blade went into the arm and struck the long bone and basically embedded the tip of the knife which broke off and left the tip in the bone." He identified a number of defensive wounds on Montero's hands, "consistent ... with struggle."

Kay Belschner, a senior criminalist, testified that she examined two pieces of Kenia's clothing; sweatpants and shoes from defendant; and pants, a top and a brassiere from Montero. She compared blood on the clothing to blood samples obtained from Montero and defendant. She also examined blood stains from the area of the homicide and from the furniture in Montero's apartment. She found defendant's blood "on his own clothing, his pants, and his shoes. There was one stain on the child's pants that was his type. . . On [Montero's] clothing there was a stain and a cast-off that were also his type. It was on her left pant leg." On defendant's sweatpants she found a variety of blood stains. "There is some heavy staining up in the front. There are some smears and wipes. There are some what I would classify as little dribbles. There are a number of spatters that go primarily downward. Many of them go towards the inseam primarily on the left leg. . . They are on the thigh and the lower calf area." All of the stains on defendant's pants were his own blood. The downward direction of the blood stains "suggest[s] an interpretation that the person wearing the pants was standing at the time." All of the blood stains on defendant's shoes were also his blood, except for one drop that was Montero's. Many of the blood drops on defendant's shoes "are clear heavy downward drops. They would have come from above the shoe."

Belschner also found one stain of defendant's blood on Montero's pants, around the knee of the left leg. She opined that the blood had been flung from an object that had blood on it, such as a knife or a finger. She stated that it was likely that Montero was standing up when the blood was flung onto her pants, and that it was flung from in front of or beside her. She said that it "might be possible, but it would be a little less likely" that Montero was lying down horizontally at the time the blood was flung. She was asked, "[I]n your investigations-and you have had quite a bit of experience with blood-does it sometimes occur that you don't find blood where you expect it to be. . . ?" She replied, "Yes, it does." Although she "expected to find a significant amount of Maria Montero's blood on Mr. Pantoja's pants," the fact that she did not would not invalidate her conclusions. "[T]here are probably explanations for why it didn't get on the pants with angles and ... positioning of people. It might have gone somewhere else and not strictly on the pants. It doesn't change anything about how his blood got on his own pants.

On cross-examination, Belschner stated that although she had tested

4

many of the stains on defendant's pants, she had not tested "every single stain on the pants." She stated that the drop of defendant's blood that was on Montero's pants could have landed there while she was lying down, but with her knee bent. She considered it more likely than not that defendant "was at least upright after he did some cutting" of his throat.

Officer Honeycutt testified that he first met Montero on April 23, 2001. Although Montero spoke Spanish and the officer spoke English, he observed that Montero was upset and agitated. Honeycutt returned later that evening with Officer Reyna-Sanchez, who spoke Spanish. After speaking with Montero, the officers went to an apartment where they found defendant. Reyna-Sanchez testified that he first met Montero on September 28, 2000, when he accompanied her to her apartment. When they arrived, defendant was there. Reyna-Sanchez told defendant that Montero "didn't want him there and that he needed to leave." Defendant was "concerned about his visitations with his daughter. . . if he and [Montero] divorced or separated." Reyna-Sanchez next met Montero on April 23, 2001, when he accompanied Honeycutt to Montero's apartment. When they spoke with defendant later that evening, he expressed concern about his ability to visit their daughter because Montero "was on the verge of separation, divorce, restraining order."

Reyna-Sanchez also testified that he spoke with defendant's cousin, who said that defendant told him the night before the killing that he had learned Montero "had started legal proceedings for child custody. . ." Defendant "was upset and nervous and concerned about losing his right to see his child. . . He said he was concerned about the possibility he might do something he might regret."

Officer Martinez testified that he came in contact with Montero in 1999. She was bruised and expressed a fear that defendant would return and attempt to take their daughter away.

The sister-in-law of Montero's brother assisted Montero in applying for a restraining order "a day or two" before Montero was killed. In the application, Montero also asked for custody of Kenia and child support.

Dr. Jose LaCalle, a "cross-cultural forensic psychologist," testified for defendant. He assessed defendant as having "a verbal IQ of 74, performance of 77, full scale IQ of 74, which places him in the borderline mentally retarded label." He observed that defendant had a deep distrust of women stemming from an incident in which he was seduced by his uncle's wife, and that defendant suffered from depression. LaCalle described defendant's relationship with Montero as "very problematic, tumultuous." He testified that defendant had "some signs of paranoid ideation of mistrusting women, always suspicious of their actions and their motives of the relationship with him," and said that defendant was "obsessive."

LaCalle interviewed defendant three times, once in 2001 and twice in

2002. During the second interview, LaCalle reported that defendant told him that when he threatened to kill himself Montero had pushed the knife into his chest, puncturing him, and that she told him that he did not "have the balls to do it." During the third interview, defendant told him that Montero had directed him to kitchen knives that were hidden under the bed. LaCalle indicated that "[i]f there were evidence that the defendant brought the knife with him," "[i]t would indicate premeditation." He also testified that defendant told him that Montero had told him "fuck your mother," a phrase which LaCalle opined "has a particularly harsh and combative character in . . . some circumstances." He stated that "In my experience, I have several cases that a person is dead after saying that. And, because of my knowledge of the Mexican cultural and Latin-American culture, I can assure you are thousands of dead people after that statement."

A forensic pathologist testified for the defense that "with medical probability" the knife that caused the wounds to defendant's chest "was in a sharpened state rather than a broken off state." He further opined that the wounds in defendant's stomach area "were inflicted after the knife had already been damaged . . ." However, he stated that he could not "preclude all of the [ ] wounds being inflicted with the knife with the tip broken." The knife wounds to defendant's chest area did not sever any major arteries or blood vessels.

Montero's son testified that he cleaned out Montero's apartment after her death. He found two knives under her bed, one of which was small and plastic and the other approximately 10 to 12 inches long and serrated. He had been in Montero's apartment when she was alive, and had been present while his mother cooked, but he had never before seen the knife that was used to kill her, or one similar to it.

The wife of defendant's brother, Alma Pantoja, testified that defendant was often "sad and depressive." Defendant told her that on the day of the killing he had asked Montero to see Kenia and she refused to let him. He said that if he could not see Kenia "then he was going to kill himself." "He said that then he grabbed a knife and put it on his chest. . . Then he said he didn't have the strength to do it. So he put the. . . knife away. And he walked somewhere else, sat down, and started crying. . . And she'll grab the knife, take it to him, and tell him that if he was-if he has the strength to do it, to go ahead and do it. Then he grabbed the knife again and put it on his chest again." She testified that although she had spoken with defendant several times since Montero's death, he had never said that he was upset at the time of the killing.

Defendant's sister also testified. Defendant was living with her in August 2001. Defendant did not tell her about a restraining order. The week before he killed Montero, defendant slept "a lot." She said that during that period defendant "was in extremely bad shape" and that he "was crying a lot and wouldn't talk."

The trial court found defendant guilty of second degree murder and found the use of a deadly weapon allegation to be true, but found him

6

>not guilty of child endangerment. The court sentenced him to 15 years to life in prison for the murder and a consecutive one-year term for use of a deadly weapon.

People v. Pantoja, No. A112972, 2007 WL 604707, at **1-6 (Cal. Ct. App. Feb. 28, 2007).

## DISCUSSION

I. <u>Standard of Review</u>

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Id.</u> § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams (Terry)</u>, 529 U.S. at 412-13. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal

7

principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

II.     Claim & Analysis

Petitioner claims that his due process rights were violated because there was insufficient evidence to support his conviction of second-degree murder. Specifically, he claims that there was insufficient evidence of malice aforethought to justify a finding of second-degree murder. Petitioner admits that the killing was intentional, but argues that it was "an unreflective explosion of violence" and requests that this Court reduce his conviction to voluntary manslaughter.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find

guilt beyond a reasonable doubt therefore states a constitutional claim which, if proven, entitles him to federal habeas relief. Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether the evidence established guilt beyond a reasonable doubt. Id. at 318-19; Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court determines only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. "The Jackson standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" Sarausad v. Porter, 479 F.3d 671, 678-79 (9th Cir. 2007) (quoting Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004)).

On habeas review, a federal court evaluating the evidence under In re Winship and Jackson should take into consideration all of the evidence presented at trial. LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, Jackson does not permit a federal habeas court to revisit credibility determinations. Id. at 957-58.

After 28 U.S.C. § 2254(d), a federal habeas court applies the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court must ask whether the operative state court decision "reflected an 'unreasonable application of' Jackson and Winship to

9

the facts of the case." Id. at 1275 (quoting 28 U.S.C. § 2254(d)(1)).

The California Court of Appeal's rejection of petitioner's insufficiency claim was not an "objectively unreasonable" application of Jackson and Winship. The court reasonably found that there was sufficient evidence to support the conviction for second-degree murder:

> The trial court reasonably found, based on substantial evidence, that defendant was guilty of murder, not manslaughter. Kenia's testimony was that defendant attacked Montero without provocation, and Bakas's testimony that she heard screams very soon after seeing Montero and Kenia enter the apartment corroborate Kenia's account of the crime. Defendant attacks Kenia's credibility because she did not remember being removed from the apartment by Bakas. However, this goes only to the weight of her testimony, and "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314). Belschner's testimony was not conclusive that defendant sustained his chest wound before he stabbed Montero. The single wound in Montero's back, the multiple wounds to her chest and abdomen, and the numerous apparently defensive wounds to her hands and arms support the inference of a conscious attempt to kill. There was also substantial evidence of motive supporting a finding of malice. Defendant was concerned that Montero would obtain custody of their daughter, and was jealous because he believed she was seeing another man. In short, while the evidence might have supported a finding that defendant acted on sudden provocation or on the unreasonable belief that he was defending himself, there was also substantial evidence that he acted with malice and was guilty of murder.

People v. Pantoja, 2007 WL 604707, at *7.

California defines murder as "the unlawful killing of a human being . . . with malice aforethought." Cal. Penal Code § 187(a). "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Id. § 188. "Murder that is committed

10

with malice but is not premeditated is of the second degree." People v. Ramirez, 39 Cal. 4th 398, 464 (2006).

California defines manslaughter as "the unlawful killing of a human being without malice." Cal. Penal Code § 192. "[A] defendant who intentionally and unlawfully kills . . . lacks malice . . . when [he] acts in a sudden quarrel or heat of passion . . . or . . . kills in unreasonable self-defense." People v. Rios, 23 Cal. 4th 450, 460 (2000). "Thus, where the defendant killed intentionally and unlawfully, evidence of heat of passion, or of an actual, though unreasonable, belief in the need for self-defense, is relevant only to determine whether malice has been established, thus allowing a conviction of murder, or has not been established, thus precluding a murder conviction and limiting the crime to the lesser included offense of voluntary manslaughter." Id. at 461.

Petitioner argues that there was insufficient evidence of malice aforethought to justify his conviction of second-degree murder. He points to parts of the record to support his argument that the killing was an "unreflective explosion of violence." Among other things, he notes that he testified that Montero told him that he should kill himself and pushed a knife into his chest.

But the respondent points to ample parts of the record that show that petitioner had the requisite malice aforethought to justify his conviction of second-degree murder. Among other things, Kenia testified that petitioner approached Montero while she was in the kitchen and, without saying anything or being provoked, started to cut Montero.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that petitioner acted with malice aforethought and was guilty of second-degree murder beyond a reasonable doubt. See Jackson, 443 U.S. at 319. The trier of fact rejected petitioner's testimony that

11

he was provoked and/or acted in self-defense, and instead believed the evidence that he acted with malice aforethought.  This court may not revisit such credibility determinations.  See Bruce, 376 F.3d at 957 (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination).  It must assume that the trial court resolved any conflicts that appeared in the record in favor of the prosecution and defer to that judgment.  See Jackson, 443 U.S. at 326.  The California Court of Appeal reasonably rejected petitioner's claim of insufficiency of the evidence under Jackson and Winship.  See U.S.C. § 2254(d); Juan H., 408 F.3d at 1274.  Petitioner is not entitled to federal habeas relief on his claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED:  Nov. 06, 2008

CHARLES R. BREYER
United States District Judge

12